IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| THE LOUISIANA FORESTRY ASSOCIATION, INC., et al., | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | CIVIL ACTION |
| | : | |
| HILDA SOLIS, et al., | : | NO. 11-7687 |
| Defendants, | : | |
| and | : | |
| | : | |
| COMITÉ DE APOYO A LOS TRABAJADORES AGRÍCOLAS, et al., | : | |
| Defendant-Intervenors | : | |

MEMORANDUM

Legrome D. Davis, J.                                                    August 20, 2012

On January 19, 2011, the Department of Labor ("DOL") issued a new regulation to govern the calculation of the minimum wage that a United States employer must offer in order to recruit foreign workers as part of the H-2B visa program ("the 2011 wage rule"). The H-2B visa program permits employers to recruit unskilled laborers from abroad to fill positions that no qualified United States worker will accept. The DOL predicts that the effect of the 2011 wage rule will be to raise the wages paid to H-2B workers and to United States workers recruited for the same jobs.

A group of associations representing employers in the logging and reforestation, hotel, carnival, sugar cane, and commercial crawfish industries (the "employer associations") brought this suit to challenge the 2011 wage rule. Members of the employer associations make use of the H-2B visa program and therefore may face higher labor costs as a result of the new rule. The

employer associations contend that the DOL lacks authority to make any legislative rules,

including the 2011 wage rule, with respect to the H-2B visa program, and that the 2011 wage rule

was issued in violation of the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 et seq.,

and the Regulatory Flexibility Act ("RFA"), id. §§ 601 et seq.

Presently before the Court are cross-motions for summary judgment filed by the employer

associations and the defendants—comprising the DOL, the Department of Homeland Security

("DHS"), and the Secretaries of both agencies (collectively, "federal defendants").  (Doc. Nos.

43, 115.)  For the reasons that follow, the federal defendants' motion (Doc. No. 43) will be

granted and the employer associations' motion (Doc. No. 115) will be denied.

I.      Factual Background and Procedural History[1]

        A.      History of Rulemaking Related to the H-2B Visa Program

        A single program—called the H-2 visa program, after its statutory section—formerly

encompassed the recruitment of unskilled foreign workers for both agricultural and non-

agricultural jobs.  See Immigration and Nationality Act ("INA"), Pub. L. No. 82-414,

§ 101(a)(15)(H)(ii), 66 Stat. 163, 168 (1952) (creating H-2 visa program).  The H-2 visa program

was administered jointly by the Attorney General and the Secretary of Labor.  Id.; Certification of

Temporary Foreign Labor for Industries Other than Agriculture or Logging, 33 Fed. Reg. 7570,

7570-71 (May 22, 1968).[2]

---

[1] The background of this case has already been set out in the Court's memorandum dated
June 25, 2012, concerning amendment of the pleadings.  (Doc. No. 138.)  Only the information
most relevant to the motions presently under consideration is recited here.

[2] The DOL's involvement in the H-2 visa program—then or now—should be
unsurprising, given the DOL's historic role in administering the nation's immigration laws.
Indeed, when the DOL was first created in 1913, it housed the Bureau of Immigration and the

During this period, the DOL issued regulations that governed the H-2 visa program, including its non-agricultural component.  See 33 Fed. Reg. at 7570-71.  The regulations provided that a regional administrator would consider labor certification applications for temporary workers and would "issue them if he finds that qualified persons in the United States are not available and that the terms of employment will not adversely affect the wages and working conditions of workers in the United States similarly employed."  20 C.F.R. § 621.3(a) (1968).

Congress bifurcated the H-2 visa program in 1986 into the H-2A program, for agricultural workers, and the H-2B program, for unskilled, non-agricultural workers.  Immigration Reform and Control Act of 1986 ("IRCA"), Pub. L. No. 99-603, § 301(a), 100 Stat. 3359, 3411.  The amended statute provided very little guidance as to the H-2B program.  Its entire discussion of the program was, and remains, limited to altering the specialized definition of "nonimmigrant" alien to mean, in part, "an alien . . . having residence in a foreign country which he has no intention of abandoning who is coming temporarily to the United States to perform [non-agricultural] temporary service or labor if unemployed persons capable of performing such

_____

Bureau of Naturalization.  See Act of Mar. 4, 1913, Pub. L. No. 426-62, § 3, 37 Stat. 736, 737. As early as 1917, the Secretary of Labor and the Bureau of Immigration, then part of the DOL, worked together to manage the importation of laborers into the United States.  See Immigration Act, Pub. L. No. 64-301, ch. 29, 39 Stat. 874, 877-78 (1917).   In 1933, the two bureaus were consolidated to form the Immigration and Naturalization Service ("INS"), which remained part of the DOL.  See Exec. Order No. 6166, § 14 (June 10, 1933), reprinted at 5 U.S.C. §§ 124-132 (1940 ed.).  The INS was transferred to the Department of Justice in 1940, see Reorganization Plan No. V of 1940, reprinted at 5 U.S.C. app. at 545 (2006 ed.), and remained there until it was dissolved by the Homeland Security Act of 2002.  See Pub. L. No. 107-296, § 471, 116 Stat. 2135, 2205.

service or labor cannot be found in this country." Id. (codified as amended at 8 U.S.C. § 1101(a)(15)(H)(ii)(b)).

In the two decades following IRCA's enactment, the DOL issued, without notice and comment, a series of letters governing the determination of prevailing wages for H-2B labor certification purposes.[3]  These letters charged the state workforce agencies that partner with the DOL with making prevailing wage determinations for H-2B occupations.  Initially, the state workforce agencies used the methodologies of the Davis-Bacon Act ("DBA"), 40 U.S.C. §§ 276a et seq., and the McNamara-O'Hara Service Contract Act ("SCA"), 41 U.S.C. §§ 6701 et seq. (formerly 41 U.S.C. §§ 351-358), to determine prevailing wages if no collective bargaining agreement was in place.  See Interim Prevailing Wage Policy for Nonagricultural Immigration Programs, Gen. Admin. Ltr. No. 4-95, at 1-2 (1995).  When no DBA or SCA wage rate was available, the state workforce agencies used wage surveys conducted by state employment security agencies or other published wage surveys.  See id. at 2.

By the mid-1990s, the DOL had begun to consider "skill levels" in determining the prevailing wages for H-2B occupations.  Initially, the DOL classified H-2B employment opportunities as either "entry level"("Level I") or "experienced level" ("Level II").  Gen. Admin. Ltr. No. 4-95, supra, at 5-6.  In 1998, the DOL began to use data from the Bureau of Labor

_____

[3] The H-2B visa program permits an employer to hire a temporary foreign worker only if United States workers are unavailable to fill a given occupation at the prevailing wage.  The availability of unskilled United States workers is, for obvious reasons, partially determined by the offered wage.  Therefore, the calculation of the prevailing wage for an occupation is of central importance in determining whether an H-2B visa should be issued.  In Fla. Sugar Cane League v. Usery, 531 F.2d 299, 304 (5th Cir. 1976), the court explained the "all-important proviso" under the H-2 visa program that foreign labor is permitted only when domestic labor is unavailable and not merely when it would be expedient to hire foreign labor rather than raise wages.

Statistics' Occupational Employment Statistics ("OES") program to set prevailing wages if a DBA or SCA wage determination was not available.  See Prevailing Wage Policy for Nonagricultural Immigration Programs, Gen. Admin. Ltr. No. 2-98, at 1 (1997).  The DOL continued to break its prevailing wage determinations into two skill levels based on the job description provided by the employer.  Id. at 5.

The H-1B Visa Reform Act of 2004 created a four-tier system to be used for determining prevailing wages in the "specialty occupations" covered by the H-1B visa program based on the skill level required for the job.  Pub. L. No. 108-447, div. J, tit. IV, § 423, 118 Stat. 2809, 3353-54 (codified at 8 U.S.C. § 1182(p)(4)).  In a 2005 letter, the DOL applied the four-tier system of the H-1B Visa Reform Act to the H-2B visa program.  Mem. to SWA Adm'rs from Emily Stover DeRocco, Asst. Sec'y for Emp't & Training, Revised Prevailing Wage Determination Guidance (May 17, 2005).  The 2005 letter also made the OES program the main source of data for establishing prevailing wages in the absence of a collective bargaining agreement.  Id.  Like its predecessors, the 2005 letter was issued without notice and comment.

In 2008, the DOL promulgated, through notice-and-comment rulemaking, regulations to govern the labor certification process for the H-2B visa program ("the 2008 wage rule").  See Labor Certification Process, 73 Fed. Reg 78,020 (Dec. 19, 2008) (codified at 20 C.F.R. part 655).  These regulations codify various aspects of the 2005 guidance.  The 2008 wage rule provides that, in the absence of a collective bargaining agreement, "the prevailing wage for labor certification purposes shall be the arithmetic mean . . . of the wages of workers similarly employed at the skill level in the area of intended employment" using OES data.  20 C.F.R. §

5

655.10(b)(2).[4]  In applying the 2008 wage rule, the DOL uses the four-tier system set out in the 2005 guidance letter.

       B.     Legal Challenge to the 2008 Wage Rule

Organizations representing foreign and United States workers impacted by the H-2B program filed a challenge in this Court in 2009 to various aspects of the 2008 wage regulation. See Comité de Apoyo a los Trabajadores Agrícolas v. Solis ("CATA"), No. 09-240, 2010 WL 3431761 (E.D. Pa. Aug. 30, 2010).  The case was assigned to Judge Louis H. Pollak.[5]  In an opinion issued on August 30, 2010, Judge Pollak held that the DOL had violated the APA by importing into the H-2B program a skill-level methodology derived from the H-2A program without ever explaining its reasons for doing so.  Id. at *25.  Judge Pollak also concluded that the four-tier wage structure set out in the 2005 letter was itself a legislative rule, which had not been subject to notice and comment and was therefore invalid.  Id.  Out of concern that vacating the four-tier skill-level methodology would create a regulatory gap, Judge Pollak left the 2008 wage rule in place, but ordered the DOL to promulgate a replacement regulation within 120 days of the date of his opinion.  Id.  Almost two years later, the 2008 wage rule remains in effect.

       C.     The 2011 Wage Rule

The wage rule that is the subject of the present challenge was promulgated as a replacement for the invalidated 2008 wage rule.  On October 5, 2010, the DOL issued a notice

---

[4] Alternately, the 2008 wage rule permits employers to submit their own wage data, provided certain conditions are met.  20 C.F.R. § 655.10(b)(3)-(5), (f).

[5] The present case was also assigned to Judge Pollak when it was transferred to the Eastern District of Pennsylvania.  Both cases were reassigned to me on May 16, 2012, after Judge Pollak's death.

setting forth a proposed rule governing prevailing wage determinations related to the H-2B

program.  See Wage Methodology for the Temporary Non-Agricultural Employment H-2B

Program, 75 Fed. Reg. 61,578 (Oct. 5, 2010) (hereinafter, "Proposed Rule").  In its notice, the

DOL stated that it was concerned that the four-tier skill-level methodology did not produce "the

appropriate wage necessary to ensure U.S. workers are not adversely affected by the employment

of H-2B workers."  Id. at 61,579.  The proposed rule redefined the prevailing wage as the highest

of: (1) the wage set forth in a collective bargaining agreement between the union and the

employer, if one exists; (2) the applicable wage rate established under the DBA or the SCA, if

such wage rate has been determined for the relevant occupation; or (3) the arithmetic mean of the

wages of workers similarly employed in the occupation, as determined by the OES program.  Id.

at 61,579-80.

The DOL opined that the proposed rule "will best achieve the Department's policy

objectives of ensuring that wages of U.S. workers are more adequately protected and, thus, that

employers are only permitted to bring H-2B workers into the country where the wages and

working conditions of U.S. workers will not be adversely affected."  Proposed Rule, supra, 75

Fed. Reg. at 61,581.  The DOL specifically requested "comments from the public on alternatives

for calculating a prevailing wage that provides adequate protections to U.S. and H-2B workers."

Id.

The DOL received more than 300 comments on the proposed rule, 251 of which it

deemed to be original.  Wage Methodology for the Temporary Non-Agricultural Employment H-

2B Program, 76 Fed. Reg. 3452, 3453 (Jan. 19, 2011) (hereinafter, "Final 2011 Rule").  As

explained in the preamble to its final rule, the DOL determined that, as a result of "[t]he

predominance of Level I wages in the program, wages based on the mean of the bottom one-third of all reported wages" the skill-level methodology "artificially lowers the wage to a point that it no longer represents a market-based wage for the occupation."  Id.  at 3463, 3477.  Based on this finding, the DOL chose to abandon the use of skill levels in the determination of prevailing wages for H-2B purposes.  The final wage rule hewed closely to the proposed rule, but in response to comments, added a mechanism by which employers may request permission to submit their own wage surveys in limited circumstances.  See id. at 3466-67, 3484.

The DOL projected that the revised rule would result in average hourly pay increases of $4.83 per hour for H-2B workers and U.S. workers recruited in conjunction with H-2B visa applications.  Final 2011 Rule, supra, 76 Fed. Reg. at 3470-71.  According to the DOL's estimate, the total annual "transfer cost" of the rule, defined as the total additional wages all employers participating in the H-2B program would be required to pay to H-2B workers as a result of the rule, would be $847.4 million.  Id.

The 2011 wage rule was originally set to go into effect on January 1, 2012.  Id. at 3452.  The DOL later moved the effective date forward to September 30, 2011, to comply with a court order in the CATA litigation.  Amendment of Effective Date of Wage Methodology, 76 Fed. Reg. 45,667 (Aug. 1, 2011); see CATA v. Solis, No. 09-240, 2011 WL 2414555 (E.D. Pa. June 16, 2011).  The DOL has since postponed implementation of the 2011 wage rule three times in response to the present suit; a parallel suit in the United States District Court for the Northern District of Florida, see Bayou Lawn & Landscape Serv. v. Solis, No. 11-445 (N.D. Fla. filed Sept. 21, 2011); and provisions contained in appropriations legislation barring the expenditure of funds to implement the rule.  See Postponement of Effective Date, 76 Fed. Reg. 59,896 (Sept. 28,

2011); Delay of Effective Date, 76 Fed. Reg. 73,508 (Nov. 29, 2011); Delay of Effective Date, 76 Fed. Reg. 82,116 (Dec. 30, 2011).  The 2011 wage rule currently is set to go into effect on October 1, 2012.  Id.

In the meantime, the DOL has essentially been forced to continue operating under the 2008 wage rule that Judge Pollak deemed invalid on August 30, 2010, *almost two years ago*. See 76 Fed. Reg. 82,116, 82,117 (commenting that Congress's explicit refusal to fund the 2011 wage rule in the Consolidated Appropriations Act of 2012 led to "the distinct possibility that [the DOL] would be unable to operate the H-2B program for the remainder of FY 2012 if the effective date of the Wage Rule were not postponed" once again).  Yet the parties inform us that they see no end in sight.  During oral argument, counsel for the federal defendants represented that he knew of nothing imminent in Congress with respect to this matter.  Hr'g Tr. 3, June 28, 2012.  And counsel for the employer associations similarly stated that "we are not anywhere close to a final resolution."  Hr'g Tr. 5.  In fact, the only congressional action we heard about involved preliminary efforts to extend the *status quo* (and presumably, the life of the remarkably persistent 2008 wage rule) through the end of fiscal year 2013.  Hr'g Tr. 5-6.

D.     The Louisiana Proceedings

The employer associations filed the present action on September 7, 2011, as Civil Action No. 11-1623 in the United States District Court for the Western District of Louisiana.  The case was assigned to Judge Dee Drell.  In their complaint, the employer associations challenge the validity of the 2011 wage rule under the APA and the RFA and request declaratory and

injective relief.  (Doc. No. 1, at 37-47.)[6]

Shortly after the complaint was filed, the plaintiffs in <u>CATA</u> filed an unopposed motion to intervene as defendants in the Louisiana litigation, followed by a motion to transfer venue to this Court.  (Doc. Nos. 10, 14.)  On December 13, 2011, Judge Drell issued an order transferring venue and denying, without prejudice, the employer associations' motion for a preliminary injunction.  <u>See</u> <u>La. Forestry Ass'n, Inc. v. Solis</u>, 814 F. Supp. 2d 655 (W.D. La. 2011).

After Judge Drell transferred the case to this Court, the parties filed the cross-motions for summary judgment that are currently pending.  We heard oral argument on June 28, 2012, and the motions are now ripe for disposition.

II.    <u>Legal Analysis</u>

This Court has jurisdiction pursuant to 28 U.S.C. § 1331 and 5 U.S.C. §§ 611(a) and 704.  The employer associations have standing based on the economic harm that their members, as employers participating in the H-2B program, may suffer if the 2011 wage rule is permitted to take effect.  <u>See</u> <u>Hunt v. Wash. State Apple Advertising Comm'n</u>, 432 U.S. 333, 342 (1977) (associational standing); <u>Nat'l Credit Union Admin. v. First Nat'l Bank & Trust Co.</u>, 522 U.S. 479, 488 (1998) (APA standing).

In challenges to agency action brought under the APA, summary judgment is the "mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review."  <u>Sierra Club v.</u>

---

[6] Initially, the employer associations also raised challenges under the APA, the RFA, and the Takings Clause to the DOL's acceleration of the effective date of the 2011 wage rule from January 1, 2012, to September 30, 2011.  (Doc. No. 1, at 48-49.)  Those challenges became moot as a result of the DOL's subsequent postponement of the effective date.

Mainella, 459 F. Supp. 2d 76, 90 (D.D.C. 2006) (citations omitted).  "The task of the reviewing

court is to apply the appropriate APA standard of review, 5 U.S.C. § 706, to the agency decision

based on the [administrative] record."  Fla. Power & Light Co. v. Lorion, 470 U.S. 729, 743-44

(1985).[7]  Pursuant to 5 U.S.C. § 706, the reviewing court is to "hold unlawful and set aside

agency action, findings, and conclusions" that are, inter alia, (1) "in excess of statutory

jurisdiction, authority, or limitations, or short of statutory right;" (2) "without observance of

procedure required by law;" or (3) "arbitrary, capricious, an abuse of discretion, or otherwise not

in accordance with the law." 5 U.S.C. § 706(2)(A), (C) & (D).

The employer associations' claims fall into two categories: (1) a challenge to the DOL's

authority to promulgate legislative rules with respect to the H-2B program; and (2) various

challenges relating to the DOL's decision-making process in promulgating the 2011 wage rule.

---

[7] The employer associations ask us to consider documents not appearing in the administrative record, including expert declarations, a deposition transcript, a wage calculation, House and Senate bills, a public law, government documents, and a judicial opinion.  Some of the documents submitted by the employer associations—i.e., the judicial opinion, the bills and public law, and the government documents—constitute legal authority or present facts that are judicially noticeable.  Fed. R. Evid. 201(b); e.g., Kos Pharma., Inc. v. Andrx Corp., 369 F.3d 700, 705 & n.5 (3d Cir. 2004) (judicial notice of documents from agency's website).  Those documents have been considered to the extent that they are relevant to the issues before us.

We will not consider the remaining documents.  "In a challenge to administrative action under the APA, the administrative record cannot normally be supplemented."  NVE, Inc. v. Dep't of Health & Human Servs., 436 F.3d 182, 189 (3d Cir. 2006); see also 5 U.S.C. § 706 ("the court shall review the whole record or those parts of it cited by a party").  A party seeking to supplement the administrative record must make a "strong showing" that an exception to the normal rule applies.  See Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 420 (1971).  The employer associations have not made such a showing.  The proffered materials contain opinions related to the merits of DBA and SCA wage surveys that were not submitted to the DOL during the comment period, as well as information about events that happened after the rulemaking proceedings.  These documents are not useful to us in evaluating the DOL's action in publishing the 2011 wage rule.

Each category of claims will be considered in turn.

    A.    <u>Challenge to the DOL's Authority to Make Rules</u>

The employer associations argue that the DOL lacks the authority to make legislative rules with respect to the H-2B program because the INA charges the DHS, not the DOL, with administering the program and because the DHS's power to make legislative rules related to the program is non-delegable and/or was not delegated.  (Doc. No. 115, at 11-36.)[8]

Before resolving these claims, it is helpful to review the statutory and regulatory framework governing the H-2B visa program.  As noted above, the INA defines "nonimmigrant" to include "an alien having residence in a foreign country which he has no intention of abandoning who is coming temporarily to the United States to perform [non-agricultural] temporary service or labor if unemployed persons capable of performing such service or labor cannot be found in this country."  8 U.S.C. § 1101(a)(15)(H)(ii)(b).  The INA also confers broad authority and discretion on the DHS to promulgate regulations regarding the issuance of nonimmigrant visas generally: 8 U.S.C. § 1184(a)(1) provides that "[t]he admission to the United States of any alien as a nonimmigrant shall be for such a time and under such conditions as [the DHS] may by regulations prescribe."[9]  With regard to the H-2B program, the statute specifies, in

---

    [8] The logical (and ironic) implications of the employer associations' argument are worth noting.  If the DOL lacked statutory authority to promulgate the 2011 wage rule, it also lacked authority to promulgate the 2008 wage rule and, indeed, all prior legislative rules the agency has adopted with respect to the H-2B visa program.  <u>See</u> Hr'g Tr. 40-41, June 28, 2012 (concession by employer associations that, in their view, the DOL has never promulgated a valid rule with respect to the H-2B program).  The employer associations thus call into question the foundations of a scheme from which they have long benefitted.

    [9] The statute contains the words "Attorney General" and "Commissioner," referring to the Commissioner of the now-defunct INS. In the Homeland Security Act, Congress abolished the INS and transferred jurisdiction to enforce and administer the immigration laws from the

relevant part, that:

> The question of importing any alien as a nonimmigrant under subparagraph (H) . . . of section 1101(a)(15) of this title . . . in any specific case or specific cases shall be determined by [the DHS], after consultation with appropriate agencies of the Government, upon petition of the importing employer.  Such petition, shall be made and approved before the visa is granted.  The petition shall be in such form and contain such information as [the DHS] shall prescribe. . . .

8 U.S.C. § 1184(c)(1).

By regulation, the DHS has designated the DOL as an agency from which it shall seek

advice in determining whether to issue H-2B visas and has defined the scope of the advice it

seeks.  The regulation provides, in pertinent part:

> (A) Prior to filing a petition with [the DHS] to classify an alien as an H-2B worker, the petitioner shall apply for a temporary labor certification with the Secretary of Labor for all areas of the United States. . . .  The labor certification shall be advice to [the DHS] on whether or not United States workers capable of performing the temporary services or labor are available and whether or not the alien's employment will adversely affect the wages and working conditions of similarly employed United States workers.
> . . .
>
> (C) The petitioner may not file an H-2B petition unless the United States petitioner has applied for a labor certification with the Secretary of Labor . . . and has obtained a favorable labor certification determination . . .
>
> (D) The Secretary of Labor . . . shall . . . establish procedures for administering the temporary labor certification program under his or her jurisdiction.

8 C.F.R. § 214.2(h)(6)(iii).

H-2B visas are issued by the DHS, upon the application of a qualifying employer.

Pursuant to 8 C.F.R. § 214.2(h)(6)(iii), before filing an H-2B visa application, an employer must

---

Attorney General and the INS to the DHS and its agencies.  See note 2, supra.  Authority to adjudicate nonimmigrant visa petitions, including H-2B petitions, now rests with United States Citizenship and Immigration Services, an agency within the DHS.  6 U.S.C. § 271.

obtain a labor certification from the DOL.  A labor certification constitutes the DOL's

determination that the employer has demonstrated that "there is an insufficient number of U.S.

workers who are qualified and who will be available for the job opportunity for which

certification is sought and that the employment of the H-2B workers will not adversely affect the

benefits, wages, and working conditions of similarly employed U.S. workers."  20 C.F.R. §

655.50.  To apply for a labor certification, an employer must first obtain from the DOL a

prevailing wage determination for the area of intended employment, submit a work order with a

state workforce agency serving the geographical area of intended employment, and advertise the

position at a wage equal to or higher than the prevailing wage.  20 C.F.R. § 655.10.  Although an

approved labor certification is required for an H-2B visa to be granted, a labor certification does

not constitute a final determination of eligibility for an H-2B visa.  The power to make that final

determination rests with the DHS.[10]

---

[10] The INS's commentary in the preamble to the final rule promulgating 8 C.F.R. § 214.2(h)(6)(iii) reflects the understanding that the Attorney General—who since has been replaced in this capacity by the DHS Secretary—had the sole responsibility for the H-2B program, but that the DOL had autonomy to determine the processes it employs in issuing labor certifications.  See Temporary Alien Workers Seeking Classification Under the Immigration and Nationality Act, 55 Fed. Reg. 2606 (Jan 26, 1990).  In response to an employer comment condemning the process by which the DOL issued labor certifications, the INS described the DOL's role in the H-2B program and explained that such comments were properly directed to the DOL, not the INS:

> The [INS] must seek advice from the Department of Labor under the H-2B classification because the statute requires a showing that unemployed U.S. workers are not available to perform the services before a petition can be approved.  The Department of Labor is the appropriate agency of the Government to make such a labor market finding.  The [INS] supports the process which the Department of Labor uses for testing the labor market and assuring that wages and working conditions of U.S. workers will not be adversely affected by employment of alien workers.  The concerns of commenters that the labor certification process is too time-consuming and

14

1.      The DHS's Conditioning of Grant of H-2B Visa on Labor Certification

We will first consider the employer associations' claim that the DHS may not condition

its own granting of H-2B visas on the receipt of labor certifications from the DOL.

The INA vests the DHS with broad and clear authority to regulate the form and content of

an H-2B visa petition and to determine the conditions and procedures for admission to the

country under the H-2B program.  8 U.S.C. §§ 1101(a)(15)(H)(ii)(b), 1184(a).  The INA

specifically contemplates that DHS's procedures will involve "consultation with appropriate

agencies of the Government" to determine whether an H-2B visa should issue.  Id. § 1184(c)(1).

However, the statute does not specify the scope of the advice the DHS may seek, and it does not

indicate which sister agencies are the "appropriate agencies" to consult.[11]

The federal defendants argue that, to the extent that 8 U.S.C. § 1184 is silent as to

whether the DHS may require labor certifications from the DOL as part of the H-2B visa

application process, the DHS has reasonably resolved that question by adopting 8 C.F.R.

---

burdensome have been relayed to the Department of Labor.

Id. at 2617.  This response reflects both that the DOL's role in the H-2B program is
ultimately that of an advisor and that the DOL has considerable autonomy with regard to
the issuance of labor certifications.

In another part of the preamble, the INS made clear that it alone was responsible
for administering the H-2B program.  In a comment on the proposed rule, the DOL
expressed concerns about its ability to enforce the requirement that H-2B workers not
displace U.S. workers.  In response, the INS stated "[s]ince the Attorney General has sole
responsibility for administering the H-2B classification, the service will enforce this
requirement." 55 Fed. Reg. at 2616.

[11] By contrast, with regard to the H-2A agricultural worker program, the statute specifies
that the "appropriate agencies of the government" are the DOL and the Department of
Agriculture.  8 U.S.C. § 1184(c)(1).

§ 214.2(h)(6)(iii) (requiring such certifications), and the agency's interpretation of the statute is owed deference under <u>Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.</u>, 467 U.S. 837 (1984). (Doc. No. 43 at 13-19.)

<u>Chevron</u> applies "when a Court reviews an agency's construction of the statute which it administers." 467 U.S. at 842. If "Congress has directly spoken to the precise question at issue" and "the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." <u>Id.</u> at 842-43. If, however, "the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." <u>Id.</u> at 843. If the agency's interpretation is "reasonable," the court must defer to it. <u>Id.</u> at 845.

Here, as in all exercises of statutory interpretation, our inquiry begins "with the language of the statute itself." <u>Caraco Pharm. Labs., Ltd. v. Novo Nordisk A/S</u>, 132 S. Ct. 1670, 1680 (2012). The INA directs DHS to make its H-2B visa determinations "after consultation with appropriate agencies of the Government." 8 U.S.C. § 1184(c)(1). As a threshold matter, we must decide whether this language is ambiguous; without ambiguity, <u>Chevron</u> deference would be inappropriate. But under <u>Chevron</u>, we do not seek ambiguity for ambiguity's sake. Rather, statutory ambiguity merely serves as a proxy for congressional intent to leave a gap for the agency to fill. <u>See</u>, <u>e.g.</u>, <u>United States v. Home Concrete & Supply, LLC</u>, 132 S. Ct. 1836, 1843-44 (2012); <u>Mayo Found. for Med. Educ. & Research v. United States</u>, 131 S. Ct. 704, 713-14 (2011).

The phrase "after consultation with appropriate agencies of the Government" epitomizes a congressional delegation of gap-filling authority. Congress entrusted the DHS to administer the

relevant portions of the INA.  The statute contemplates some consultation with other agencies but leaves the specifics of that consultation unstated.  Thus, Congress has not "directly spoken to the precise question at issue," namely, with *what agencies* the DHS can or should consult, and *how*.  Or, stated in terms of ambiguity, Congress's failure to define "consultation" and "appropriate agencies" in the H-2B context renders the pertinent statutory provision ambiguous.  See Mayo, 131 S. Ct. at 711 (finding ambiguity because statute did not define the relevant term or "otherwise attend to the precise question" at hand); Council Tree Commc'ns, Inc. v. FCC, 503 F.3d 284, 289 (3d Cir. 2007) (finding ambiguity in part because Congress did not define the operative term).  Faced with this void, DHS has exercised its regulatory authority under the statute to adopt the DOL labor certification requirement.

It was eminently reasonable for the DHS to do so because the DOL is uniquely qualified to provide advice about the potential effects of H-2B workers' employment on United States workers,[12] and because the DOL has been charged for decades with the responsibility of issuing labor certifications to employers seeking to hire temporary foreign workers.  Under Chevron, that is the end of the matter.[13]  See Pauley v. BethEnergy Mines, Inc., 501 U.S. 680, 696-97 (1991)

---

[12]The DHS (or more precisely its predecessor, the INS) has long recognized the DOL's expertise in evaluating labor markets.  See 55 Fed. Reg. 2606, 2617 (Jan. 26, 1990) (acknowledging that the "Department of Labor is the appropriate agency of the Government to make . . . a labor market finding" in the H-2B context).  Simply put, and by its own admission, "DHS . . . does not have the expertise needed to make any labor market determinations, independent of those already made by DOL."  Changes to Requirements Affecting H-2B Nonimmigrants and Their Employers, 73 Fed. Reg. 78,104, 78,110 (Dec. 19, 2008).

[13]We reach this result regardless of whether Congress's instruction to DHS to "consult[] with appropriate agencies of the Government" speaks to the agencies' jurisdiction.  See P.R. Maritime Shipping Auth. v. Valley Freight Sys., Inc., 856 F.2d 546, 552 (3d Cir. 1988) (holding that Chevron deference "is fully applicable to an agency's interpretation of its own jurisdiction."); Richard J. Pierce, Jr., Administrative Law Treatise § 3.5, at 187 (Aspen Pub., 5th

("When Congress, through express delegation or the introduction of an interpretive gap in the statutory structure, has delegated policy-making authority to an administrative agency, the extent of judicial review of the agency's policy determinations is limited.").

As just discussed, we must defer to the DHS's reasonable decision to "consult" with the DOL by adopting the labor certification requirement.  However, we would come to the same conclusion even under a less deferential, Skidmore-type standard of review.  See Skidmore v. Swift & Co., 323 U.S. 134, 140 (1944) (noting that the appropriate weight of an agency's position "will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.").

First of all, we find persuasive DHS's given rationale for making the labor certification requirement mandatory, namely that DHS "does not have the expertise needed to make any labor market determinations, independent of those already made by DOL."  73 Fed. Reg. at 78,110. This reasoning is entirely consistent with the statute, which expressly provides for "consultation with appropriate agencies of the Government."  8 U.S.C. § 1184(c).  If Congress believed the Attorney General (now the DHS) could effectively administer the H-2 visa program alone, then

_____

ed. 2010) ("Judging by the [Supreme] Court's pattern of decisions, it seems clear that Chevron applies to cases in which an agency adopts a construction of a jurisdictional provision of a statute it administers.") (citations omitted).  Remember, "the ultimate question [under Chevron] is whether Congress would have intended, and expected, courts to treat the regulation as within, or outside, its delegation to the agency of 'gap-filling' authority," which does not turn on the label (jurisdictional versus non-jurisdictional) we attach to the gap.  Mayo, 131 S. Ct. at 714.  What's more, the policy underlying Chevron deference, i.e., a recognition that agencies may have expertise that Congress and the courts lack, see Mayo, 131 S. Ct. at 713, fully applies to the instant statutory provision regarding "consultation."  We would reasonably expect the DHS–not Congress, and certainly not the courts–to best understand its own limitations (and thus, the scope of consultation necessary to adequately administer the H-2B visa program).

why include the "consultation" language?  And who better to consult regarding labor markets

than the Department of Labor?

In addition, the agencies' position is not merely a *post hoc* rationalization concocted in

response to litigation.  The DOL has been issuing labor certifications in conjunction with the H-2

program for decades.  See Certification of Temporary Foreign Labor for Industries Other Than

Agriculture or Logging, 33 Fed. Reg. 7570, 7571 (May 22, 1968) (establishing DOL regulation

governing certification process for non-agricultural workers); Nonimmigrant Classes: Special

Requirements for Admission, Extension, and Maintenance of Status, 38 Fed. Reg. 35,425,

35,427 (Dec. 28, 1973) (INS republication of regulation concerning, among other things, DOL's

role in labor certification process).  And as noted supra, note 12, the INS publicly recognized the

DOL's expertise in evaluating labor markets over twenty years ago.  See 55 Fed. Reg. 2606, 2617

(Jan. 26, 1990) (acknowledging that the "Department of Labor is the appropriate agency of the

Government to make . . . a labor market finding" in the H-2B context).

The employer associations contend that DHS improperly "offloaded" some of its

jurisdiction to the DOL by making the DOL a "co-determiner" of H-2B visa petitions.

Underlying this argument is the implicit assumption that "consultation" cannot encompass what

DHS does here, i.e., conditioning its approval of H-2B visa petitions on the DOL's labor

certification determinations.  Not so.

Both in the 1950s, when Congress passed the INA, and the 1980s, when IRCA split the

H-2 program into agricultural and non-agricultural components, the word "consult" meant to ask

for advice or seek counsel.  See Shorter Oxford English Dictionary 379 (3d ed. rev. 1955);

Merriam-Webster New International Dictionary of the English Language 23 (2d ed. 1957);

19

Compact Edition of the Oxford English Dictionary 884-85 (Jan. 1984); Random House Dictionary of the English Language 437 (2d ed. 1987); Webster's Ninth New Collegiate Dictionary 282 (1988). "Consultation" means, of course, the act of consulting. See id. Importantly, we see nothing in the definitions indicating that "consultation" necessarily entails rejecting the given advice from time to time.

Consider a sick patient who sees his doctor for a "consultation." The patient tells the doctor beforehand, "I'll do whatever you recommend. You're the expert, after all." The fact that the patient invariably takes the doctor's advice does not make the doctor-patient meeting any less of a "consultation." It simply reflects the reality, correctly recognized by the patient, that the doctor knows best when it comes to medical issues. The same reasoning applies here: DHS takes the DOL's advice on the labor certification question because DHS understands that the DOL has unrivaled expertise in this particular field. But it is still just a "consultation," which the INA expressly permits.

This conclusion is bolstered by review of other cases in which an administrative agency has conditioned the exercise of its own authority on the decision of another entity. See U.S. Telecom Ass'n v. FCC, 359 F.3d 554, 567 (D.C. Cir. 2004) (collecting cases). As stated by the D.C. Circuit Court, if Congress confers on an agency "broad discretion to permit or forbid certain activities," the agency's discretion ordinarily also encompasses "condition[ing] its grant of permission on the decision of another entity . . . so long as there is a reasonable connection between the outside entity's decision and the federal entity's determination." Id. Here, Congress conferred broad discretion on the DHS to set rules governing the importation of foreign workers as part of the H-2B visa program. The DHS has chosen, pursuant to its statutory prerogative to

"consult" with other government agencies, 8 U.S.C. § 1184(c)(1), to condition its grant of permission to import foreign workers as part of the H-2B visa program on the DOL's labor certification determination.  The DOL's labor certification is reasonably connected to the DHS's ultimate determination whether a foreign worker admitted under an H-2B visa would displace a capable unemployed United States worker.  Therefore, the DHS may condition its grant of an H-2B visa on receiving a labor certification from the DOL.  The ultimate decision-making authority still remains with the DHS.  Cf. U.S. Telecom Ass'n, 359 F.3d at 568 ("[A] federal agency may turn to an outside entity for advice and policy recommendations provided that the agency makes the final decisions itself.").

The employer associations' argument to the contrary is unpersuasive.  In particular, they direct our attention to Union Pacific Railroad v. Brotherhood of Locomotive Engineers, 130 S. Ct. 584 (2009).  But Union Pacific addressed the wholly distinct question of whether an agency may decline to exercise jurisdiction conferred upon the agency by Congress.  The court held that "[b]y refusing to adjudicate cases on the false premise that it lacked power to hear them" the agency failed "to conform or confine itself to the jurisdiction Congress gave it." Id. at 599 (internal citation and quotation marks omitted).  Union Pacific does not speak to the issue presented here.  The DHS has not declined to exercise powers given to it by Congress; instead, it has exercised those powers to specify the conditions under which an H-2B visa will be issued, including the prerequisite condition of the DOL labor certification.

We thus conclude that 8 C.F.R. § 214.2(h)(6) is a reasonable construction of the INA and must be upheld under Chevron.  A Skidmore-type analysis leads us to the same result.  The DHS may condition its own grant of H-2B visas on labor certifications from the DOL.

Relatedly, the employer associations also assert that, in enacting the INA, Congress

unlawfully delegated its legislative power to the DOL by failing to lay down an "intelligible

principle" that "meaningfully constrains" the DOL's discretion.  See United States v. Amirnazmi,

645 F.3d 564, 575-76 (3d Cir. 2011) (describing non-delegation doctrine).  We disagree.

The pertinent statute undoubtedly vests the DHS, along with the agencies it chooses to

consult, with broad discretion in administering the H-2B program.  See 8 U.S.C. § 1184(c)(1)

("The question of importing any alien as a nonimmigrant under subparagraph (H) . . . of section

1101(a)(15) of this title . . . in any specific case or specific cases shall be determined by [the

DHS], after consultation with appropriate agencies of the Government, upon petition of the

importing employer."); see also Recreation Vehicle Indus. Ass'n v. EPA, 653 F.2d 562, 569

(D.C. Cir. 1981) (Act requiring EPA to "consult with appropriate federal agencies" clearly left

the matter to the EPA's "informed discretion.").  However, Congress circumscribed this

discretion through its definition of "nonimmigrant," referenced in § 1184(c)(1): a nonimmigrant

may only be admitted on an H-2B visa "if unemployed persons capable of performing [the

relevant] service or labor cannot be found in this country."  8 U.S.C. § 1101(a)(15)(H)(ii)(b).

This constitutes an "intelligible principle" that "meaningfully constrains" not only the DHS but

the DOL as well.  In other words, *both* DHS and whatever agency it consults (here, the DOL)

must abide by the aforementioned congressional guidance, notwithstanding Congress's decision

to leave open the manner of consultation.  By directing DHS to consult with other agencies,

Congress has actually limited DHS's autonomous discretion.  It would be odd indeed to hold that

such a *limitation* violates the non-delegation doctrine, which is premised on the idea that

Congress *should limit* agency discretion to some extent.  See Terran ex rel. Terran v. Sec'y of

Health & Human Servs., 195 F.3d 1302, 1314-15 (Fed. Cir. 1999) (in requiring consultation, "Congress clearly intended the [agency] to be guided by the findings" of the consultants).

    2.    The DOL's Authority to Make Legislative Rules

The employer associations also argue that even if 8 C.F.R. § 214.2(h)(6) is a reasonable interpretation of the statutory provisions governing the H-2B program, it does not and cannot confer authority on the DOL to make legislative rules relating to the H-2B program. (Doc. No. 122 at 15-19.) If the DOL lacks rulemaking authority with respect to the H-2B program, then the 2011 wage rule cannot stand as a legislative rule.

In support of this argument, the employer associations rely on Bowen v. Georgetown University Hospital, 488 U.S. 204, 208 (1988). Bowen involved a challenge to a retroactive rule issued by the Department of Health and Human Services. Id. at 206. In assessing whether the statute at issue authorized retroactive rulemaking, the Court stated, "[i]t is axiomatic that an administrative agency's power to promulgate legislative regulations is limited to the authority delegated by Congress." Id. The Court then looked to the text, structure, and objectives of the statute to determine whether Congress intended to authorize retroactive rulemaking. Id. at 209-16.

Bowen dealt with the question whether a particular regulation exceeded the scope of Congress's grant of rulemaking authority, as opposed to the related, but logically prior, question whether the agency making the rule was authorized to make rules at all. Nevertheless, the general principle that the executive may not engage in rulemaking without congressional authorization is relevant here. The central question here, as it was in Bowen, is whether there was a congressional grant of authority that contemplated the issued regulations. The Third

Circuit has observed that this question "is so basic that it rarely arises . . . as a meaningful challenge to agency action." NVE, 436 F.3d at 190-91 (citation omitted).

The federal defendants acknowledge that they cannot point to statutory language that expressly authorizes rulemaking by the DOL with regard to the labor certification process, but they contend that, in enacting IRCA, Congress did so implicitly, and that the statute's text, structure, and objectives confirm Congress's approval of DOL rulemaking in the H-2B context. The federal defendants also argue that the agencies' reasonable construction of their own jurisdiction with regard to the H-2B program is entitled to deference.  (Doc. No. 43, at 13-19; Doc. No. 119, at 5-20.)

(a)      Statutory Basis for Rulemaking Authority

"The Supreme Court has stated repeatedly that the power of an administrative agency to administer a congressionally created program necessarily requires the making of rules to fill any gap left, implicitly or explicitly, by Congress." Council Tree Commc'ns, 503 F.3d at 288-89 (internal ellipses and citations omitted).  Agencies may "speak with the force of law" if that power is "apparent from the agency's generally conferred authority and other statutory circumstances." Home Concrete & Supply, 132 S. Ct. at 1843-44.  Here, Congress's broad grant of authority to the DHS and other "appropriate agencies," as well as the attendant circumstances described infra, legitimize the DOL's legislative rulemaking in the H-2B program.

To begin, the history of the H-2B program demonstrates Congress's expectation that the DOL would engage in legislative rulemaking.  "Congress is presumed to be aware of an administrative or judicial interpretation of a statute and adopt that interpretation when it re-enacts a statute without change." Lorillard v. Pons, 434 U.S. 575, 580-81 (1978).  As described above,

24

the modern H-2B visa program was created in 1986 through the enactment of IRCA, which bifurcated the existing H-2 visa program into agricultural and non-agricultural components.  At the time of IRCA's enactment, the DOL regulations governing the labor certification process for non-agricultural, unskilled guest workers already had been in place for many years.  There is no evidence that Congress intended to alter or disrupt the DOL's rulemaking when it enacted IRCA and created the H-2B visa program.

Looking first at the statute's text, the language Congress used to define an H-2B worker—"an alien . . . coming temporarily to the United States to perform temporary service or labor if unemployed persons capable of performing such service or labor cannot be found in this country"—is materially identical to the language in the pre-IRCA statute defining an H-2 worker. Compare 8 U.S.C. § 1101(a)(15)(H)(ii)(b), with INA § 101(a)(15)(H)(ii), 66 Stat. at 168.  That suggests an intent to preserve existing practice under the statute, and the existing practice was for the DOL to engage in rulemaking.  Before IRCA, Congress vested final authority to issue H-2 visas in the Attorney General (now the DHS) "after consultation with appropriate agencies of the government," just as it does today.  8 U.S.C. § 1184(c).  The Attorney General had required petitioning employers to apply for labor certifications from the DOL many years before IRCA's enactment, see 8 C.F.R. § 214.2(h) (1968), and the DOL, in turn, had issued regulations to govern the labor certification process for non-agricultural workers, see 20 C.F.R. § 621.3 (1968); 33 Fed. Reg. at 7570-71 (1968).

But that's not all.  Several years prior to IRCA, the Supreme Court described the regulatory scheme governing the H-2 program in Alfred L. Snapp & Sons, Inc. v. Puerto Rico, 458 U.S. 592, 595-96 (1982), observing that pursuant to 8 U.S.C. § 1184(c), the INS relied on

the DOL to make the initial determination whether unemployed persons capable of performing the work could be found in the United States.[14]   In describing the DOL's role, the Court cited to the DOL's regulations governing the H-2 program.  Id. at 596.  Thus, at the time of IRCA's enactment, Congress was presumptively aware of the Court's interpretation of 8 U.S.C. § 1184(c) as authorizing DOL regulations governing labor certifications.  See Lorillard, 434 U.S. at 580-81.

Moreover, Congress specifically acknowledged the DOL's practice of issuing legislative rules when it enacted IRCA, noting that "[d]etailed regulations governing the [H-2 agricultural and non-agricultural] program have been issued by the Employment and Training Administration in the Department of Labor (See 20 CFR Part 655) and the Immigration and Naturalization Service in the Department of Justice. (See 8 CFR 214.2(h)(3))."  H.R. Rep. No. 99-682, pt. 1, at 80 (1986).[15]   In enacting IRCA, Congress chose to leave intact the statutory text governing non-agricultural workers, and, by implication, the preexisting regulatory scheme.  See id. ("The bill makes no changes to the statutory language concerning non-agricultural H-2s.").

In CFTC v. Schor, 478 U.S. 833, 846 (1986), the Supreme Court observed that "[i]t is

---

[14]   While Snapp dealt with agricultural workers, pre-IRCA, the same regulatory scheme governed both agricultural and non-agricultural workers, and as described above, that scheme remained in place for non-agricultural workers after IRCA's enactment.

[15]During oral argument, the employer associations sought to minimize the significance of this House Report by pointing out that it refers only to 20 C.F.R. Part 655, not 20 C.F.R. Part 621.  Hr'g Tr. 59.  Employer associations' counsel represented that, at the time of this Report in 1986, Part 555 contained the agricultural regulations while the unmentioned Part 621 contained the non-agricultural regulations.  Id.  Thus, the employer associations would have us believe that Congress was aware of the DOL's history of rulemaking in the agricultural context but not the non-agricultural context, even though a unitary H-2 program encompassed both at the time.  This hairsplitting proves too much, especially since Part 655 and Part 621 *cross-referenced each other during the relevant time frame*.  See 20 C.F.R. §§ 621.1, 621.3 (1986); 20 C.F.R. § 655.1 (1986).

well established that when Congress revisits a statute giving rise to a longstanding administrative interpretation without pertinent change, the congressional failure to revise or repeal the agency's interpretation is persuasive evidence that the interpretation is the one intended by Congress." (internal quotation marks and citation omitted). In choosing to leave the statutory framework governing unskilled non-agricultural guest workers intact, while acknowledging the DOL's regulations relating to the program, Congress endorsed the agencies' interpretation of the statute as conferring rulemaking authority on the DOL.

The Supreme Court, in <u>Schor</u>, observed that deference to an agency's interpretation was "especially warranted" in a case where Congress had twice amended the applicable statute after the agency declared by regulation that it would exercise jurisdiction. <u>See id.</u> at 845-46. Since IRCA's enactment, Congress has chosen, on multiple occasions, to leave the DOL's rulemaking in the H-2B context intact. In 2005, Congress amended the H-2B program to confer enforcement powers on the DOL, without abrogating the DOL's legislative rulemaking authority. <u>See</u> REAL ID Act, Pub. L. No. 109-13, § 404, 119 Stat. 231, 319-20 (2005) (codified at 8 U.S.C. § 1184(c)(14)(B)). More recently, Congress withheld appropriations to implement the 2011 wage rule, but not the 2008 wage rule. <u>See</u> Consolidated and Further Continuing Appropriations Act, 2012, Pub. L. No. 112-55, div. B, tit. V, § 546, 125 Stat. 552, 640 (2011); Consolidated Appropriations Act, 2012, Pub. L. No. 112-74, div. F, tit. I, § 110, 125 Stat. 786, 1064 (2011). Under these circumstances, it is particularly likely that Congress agreed (and still agrees) to DOL rulemaking in the H-2B context.[16]

---

[16]The employer associations cite two failed bills, both introduced in December of 2009, as evidence of the DOL's present lack of authority to promulgate rules in the H-2B context. (<u>See</u> Doc. No. 115, at 3-5). The proposed bills would have added various provisions regarding the

The DOL's rulemaking in the H-2B program is also consistent with the objective of the statute creating the H-2B visa program, which is to permit U.S. employers to bring foreign workers to the United States to perform temporary non-agricultural work, provided that "unemployed persons capable of performing . . . service or labor cannot be found in this country." 8 U.S.C. § 1101(a)(15)(H)(ii)(B).  As elaborated above, assessing labor markets is an area of the DOL's particular institutional expertise.

     (b)    <u>Scope of the DOL's Authority</u>

Alternatively, the employer associations argue that the DOL's authority under 8 C.F.R. § 214.2(h)(6)(iii) is limited to the processing of individual labor certifications and does not encompass the issuance of legislative rules.  (Doc. 115, at 16.)  Federal defendants, by contrast, understand 8 C.F.R. § 214.2(h)(6)(iii) as inviting the DOL to exercise rulemaking authority to promulgate rules to govern the labor certification process for H-2B visas.  The pertinent DHS regulation requires the Secretary of Labor to "establish procedures for administering the temporary labor certification program under his or her jurisdiction."  <u>Id.</u>

In <u>Auer v. Robbins</u>, 519 U.S. 452 (1997), the Supreme Court held that an agency's interpretation of its own regulation is "controlling unless plainly erroneous or inconsistent with the regulation," so long as the interpretation constitutes the agency's "fair and considered

---

DOL's role in administering the H-2B program.  (<u>Id.</u>).  This argument is seriously flawed.  First, the failed bills reflect, at best, the views of a few individual members of Congress, not Congress as a whole.  Additionally, while the proposed bills might represent these particular legislators' attempts to endow the DOL with a *new power* (as employer associations' would argue), the bills also might reflect a desire to reaffirm or clarify the DOL's *existing powers*, including rulemaking.  <u>See</u> <u>United States v. Southwestern Cable Co.</u>, 392 U.S. 157, 170-71 (1968) (Mere "requests for legislation" do not reflect congressional belief that agency "did not already possess regulatory authority.").

judgment on the matter in question." Id. at 461-62.  The agencies' interpretation of 8 C.F.R.

§ 214.2(h)(6)(iii) as permitting the DOL to issue legislative rules represents their "fair and

considered judgment"; it is consistent with the purposes of the organic statute and with

longstanding agency practice.  See Id.

The agencies' interpretation of 8 C.F.R. § 214.2(h)(6)(iii) is not plainly erroneous or

inconsistent with the regulation.  Instead, the regulation's directive to the DOL to "establish

procedures for administering the temporary labor certification program" is reasonably interpreted

as authorizing legislative rulemaking.  Id.  Moreover, the DOL's choice to engage in legislative

rulemaking comports with the judicial preference for filling the interstices of the law through

quasi-legislative enactment of rules of general applicability.  See SEC v. Chenery Corp., 332 U.S.

194, 202 (1947).  Unless specifically precluded from doing so, an agency has the authority to rely

on rulemaking when the applicability of the resolution of the issue it has been called upon to

decide is not limited to the facts of the specific case before it.  See Am. Hosp. Ass'n v. N.L.R.B.,

111 S. Ct. 1539, 1543 (1991).  Here, legislative rulemaking is an appropriate, and perhaps

necessary, tool because the designation of universally applicable methodologies for determining

prevailing wages involves policy setting, as opposed to the adjudication of factual disputes in a

particular case.  Agencies generally favor rulemaking over adjudication when, as in the present

case, they change existing rules and establish widely applicable standards.  See Bell Tel. Co. of

Pa. v. FCC, 503 F.2d 1250, 1265 (3d Cir. 1974), cert denied, 422 U.S. 1026 (1975); see also

CATA, 2010 WL 3431761, at *19 (holding that the four-tier skill level methodology constitutes a

legislative rule that must be promulgated through notice and comment).  The DOL's exercise of

rulemaking authority with respect to the H-2B visa program is not in conflict with 8 C.F.R. §

214.2(h)(6)(iii).  To the extent that the regulation is unclear as to whether the DOL may issue

legislative rules, the ambiguity has been reasonably resolved by the agencies.  Cf. Auer, 519 U.S.

at 463 (discussing "Secretary's power to resolve ambiguities in his own regulations").

The agencies' interpretation of 8 C.F.R. § 214.2(h)(6)(iii) as authorizing the DOL to

promulgate legislative rules governing the issuance of labor certifications is therefore entitled to

deference.

And even if we were to decide the issue *de novo*, without Auer deference, we would

conclude that the DOL acted appropriately in promulgating its prevailing wage regulations,

essentially for the reasons just set forth.  Read in context, the most natural understanding of the

word "procedures" in 8 C.F.R. § 214.2(h)(6)(iii) encompasses rulemaking.  The employer

associations argue that, because the statute permits DHS to consult with DOL only "in any

specific case or specific cases," 8 U.S.C. § 1184(c)(1), the statute implicitly forecloses DOL

rulemaking.  We strongly disagree.  In fact, the DOL's reliance on a uniform set of rules to govern

all H-2B program participants actually guards against arbitrary labor certification determinations

in individual cases.  See Prod. Tool Corp. v. Emp't & Training Admin., U.S. Dep't of Labor, 688

F.2d 1161, 1167 (7th Cir. 1982) (recognizing that when the DOL "must decide numerous cases in

a routine fashion, the clarification of policy through rules or published pronouncements would

protect against arbitrary action.").

As envisioned by the statute, the DOL *does* advise DHS in "specific cases," e.g., by

granting or denying thousands of labor certification applications each year.  The DOL's rules

regarding prevailing wages simply set the framework–or, in the language of § 214.2(h)(6)(iii), the

"procedures"–under which the DOL processes the individual labor certification requests.  See

Final 2011 Rule, supra, 76 Fed. Reg. at 3452-53 (explaining the DOL's role in the H-2B program).  The Supreme Court has approved of this sort of agency rulemaking incident to case-by-case decisionmaking, opining that "[e]ven if a statutory scheme requires individualized determinations . . . the decisionmaker has the authority to rely on rulemaking to resolve certain issues of general applicability unless Congress clearly expresses an intent to withhold that authority."  Lopez v. Davis, 531 U.S. 230, 243-44 (2001).  Because purely case-by-case decisionmaking in thousands of cases a year "could invite favoritism, disunity, and inconsistency," the DOL need not re-determine the appropriate prevailing wage every time an employer seeks a labor certification.  Id. at 244 (an agency "is not required continually to revisit issues that may be established fairly and efficiently in a single rulemaking proceeding.") (citation and internal quotation marks omitted).

> B.  Challenges to the 2011 Wage Rule

The employer associations' remaining arguments focus on the DOL's adoption of the 2011 wage rule, as opposed to the DOL's rulemaking authority.

> 1.  Remaining APA Challenges

The employer associations raise several substantive and procedural challenges to the 2011 wage rule under the APA.  "Judicial review [under the APA] focuses on the agency's decision making *process* not on the decision itself."  NVE, 436 F.3d at 190 (emphasis in original).  In promulgating a legislative rule such as the 2011 wage rule, an agency "must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made."  Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983) (internal quotation marks and citation omitted).  A court

will set aside agency action as arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  Id.  In reviewing a case under the APA, a court must be careful "not to substitute its judgment for that of the agency."  Id.

      (a)      <u>Sufficiency of Reference to Legal Authority in Rule's Text</u>

The APA requires that an agency make "reference to the legal authority under which the rule is proposed" in its notice of proposed rulemaking.  5 U.S.C. § 553(b)(2).  Such reference must be "sufficiently precise to appraise interested persons of the agency's legal authority to issue the proposed rule."  Attorney General's Manual on the Administrative Procedure Act 29 (1947).

In its October 5, 2010, notice of proposed rulemaking, the DOL stated, "[t]he legal basis for the proposed rule is the Department's authority, as delegated from the DHS under its regulations at 8 C.F.R. § 214.2(h)(6), to grant temporary labor certifications under the H-2B program."  Proposed Rule, <u>supra</u>, 75 Fed. Reg. at 61,584.  The employer associations contend that because 8 C.F.R. § 214.2(h)(6) is the only authority explicitly cited as a "legal basis for the proposed rule" in the notice of proposed rulemaking, it is the only basis of rulemaking authority upon which the DOL may now rely.  (Doc. No. 115, at 13.)

It is true that the statement quoted above, if considered in isolation, is problematic.  We have upheld the DOL's rulemaking authority in this context based on Congress's implicit authorization, in addition to the DHS's delegation in 8 C.F.R. § 214.2(h)(6).  But the notice must be read in context, particularly in light of the discussion of the general statutory scheme in other

sections of the rule.  See Hooker Chems. & Plastics Corp. v. Train, 537 F.2d 620, 629-30 (2d Cir. 1976) (rejecting similar challenge by explaining that the preamble to the regulations set forth the regulations' legal basis).  The section of the notice that sets out the legal basis for the rule refers to the DHS's authority to make rules with regard to the H-2B program.  Proposed Rule, supra, 75 Fed. Reg. at 61,584.  This reference is elaborated in the section of the notice setting out the statutory standard relating to prevailing wages, in which the DOL cites the definition of H-2B nonimmigrant, 8 U.S.C. § 1101(a)(15)(H)(ii)(b), and to 8 U.S.C. § 1184(c)(1), which requires the DHS to consult with appropriate government agencies before approving an H-2B petition. Proposed Rule, supra, 75 Fed. Reg. at 61,578.[17]  These provisions form the basis of the DOL's rulemaking authority and the recitation of them provided sufficiently detailed notice to the public of the DOL's authority.  See United States v. Stevenson, 676 F.3d 557, 563 (6th Cir. 2012) (explaining that "[t]he APA does not require that the proposed rule cite the relevant legal authority in a certain location.").

     (b)    Rational Explanation Requirement

The employer associations contend that the DOL violated the APA's procedural requirements by failing to rationally explain its claimed problem, its proposed solution, and the connection between them. (Doc. No. 115 at 57-63.)  In particular, the employer associations object to: (1) the DOL's explanation of why it chose to use the highest wage rate produced by the various available data sources; (2) the DOL's explanation of its decision to rely on DBA and SCA

---

[17]These are the very same statutory provisions the DOL cited over forty years ago as legal authority to promulgate its 1968 regulations concerning the non-agricultural H-2 program.  See 33 Fed. Reg. at 7571 ("AUTHORITY: The provisions of this Part 621 issued under 8 U.S.C. 1101, 1184; 8 CFR 214.2.").

wage rates; and (3) the DOL's definition of the relevant universe for purposes of determining whether a wage rate had an adverse impact. (Doc. No. 115 at 64-73.)

The DOL considered commentators' concerns about its decision to rely on the highest of the three wage rates, explaining that it believed that by requiring the highest wage it was "guaranteeing that the jobs are offered to available workers at wages that do not create an adverse effect." Final 2011 Rule, supra, 76 Fed. Reg. at 3455. Similarly, the DOL adequately explained its decision to use the SCA and DBA wage rates. The DOL specifically addressed commentators' objections to the SCA and DBA wage rates and concluded that "commentators' concerns with the consistency, timeliness, and validity of the SCA and DBA wage determinations are unfounded," citing, in particular, to recent improvements in the SCA wage determination methodology. See id. at 3455-56. Finally, the employer associations would have the DOL look to the entire domestic labor market to determine whether below-market H-2B wage rates had an adverse impact. (Doc. No. 119 at 29.) The DOL's decision to look instead to "workers who are similarly employed" in jobs occupied by H-2B workers to define the relevant universe is reasonable. Final 2011 Rule, supra, 76 Fed. Reg. at 3463. The DOL's responses to commentators' concerns demonstrate that the DOL considered relevant objections and offered a reasoned explanation of the course of action it chose to take. That is all that is required.

### 2. Four-Tier Wage Regime

The employer associations argue that, under 8 U.S.C. § 1182(p)(4), the DOL is required to use four skill levels when setting wage rates. (Doc. No. 115, at 52-55.) Section 1182(p)(4) provides that when the DOL calculates prevailing wage rates using OES data, it must calculate "at least 4 levels of wages commensurate with experience, education, and the level of supervision."

34

Read out of context, § 1182(p)(4) might provide support for the employer associations' argument that the DOL must use at least four skill levels in the H-2B context.

However, a court will look beyond the language of a statutory provision where a literal reading of that language "will produce a result demonstrably at odds with the intentions of its drafters." Griffin v. Oceanic Contractors, Inc., 458 U.S. 564, 571 (1982). Section 1182(p)(4) was enacted as part of the "H-1B Prevailing Wage Level" section of the "L-1 Visa and H-1B Visa Reform Act," Pub. L. No. 108-447, div. J, tit. IV, § 423, 118 Stat. 2809, 3353-54 (2004). Section 1182(p)(4)'s applicability is limited by the title of the section of which it is a part. See INS v. Nat'l Ctr. for Immigrants' Rights, 502 U.S. 183, 189 (1991) (reading a generic term in light of more specific language contained in the title of the paragraph of which the generic term is a part). The section's title makes clear that Congress intended for the four-tier system of calculating prevailing wages to apply to H-1B occupations, which require theoretical or technical expertise in specialized fields. See 8 U.S.C. §§ 1101(a)(15)(H)(i)(b), 1184(i)(1) (defining "specialty occupation" as "an occupation that requires . . . theoretical and practical application of a body of highly specialized knowledge"). To apply the four-tier methodology of calculating prevailing wages to occupations in which there are no significant skill-based wage differences makes little sense, and is contrary to congressional intent. See Final 2011 Rule, supra, 76 Fed. Reg. at 3460-61 (finding that "skill-based wage differences do not appear to exist to any significant degree" in H-2B occupations and that any small differences that might exist "are not reflected in the OES survey data").

The employer associations argue that the text of § 1182(p)(4) is unambiguous, so we cannot look to the title as an interpretive aid. See Pa. Dep't of Corr. v. Yeskey, 524 U.S. 206, 212

(1998) (cautioning that the title of a statute "cannot limit the plain meaning of the text" and has value only to "shed[] light on some ambiguous word or phrase."); but see Carter v. United States, 530 U.S. 255, 276-77 & n.2 (2000) (Ginsburg, J., dissenting) (rejecting "such a wooden and arbitrary limitation" because a title can be "illuminating, even where a court cannot pinpoint a discrete word or phrase as the source of the ambiguity."). Even so, the critical language of this statute *is* ambiguous, and the section's title definitively resolves the ambiguity. In particular, the statute mandates the use of a four-tier wage methodology "[w]here the Secretary of Labor uses . . . a governmental survey to determine the prevailing wage . . ." 8 U.S.C. § 1182(p)(4). In the quoted language, the word "where" might broadly mean "where, in every instance." Alternatively, "where" might also mean "where, in this particular program." The section's title, which references only the H-1B program, tells us that the narrower interpretation is the correct one in this instance.

      3.      Consideration of Employer Interests During Rulemaking

The employer associations rely on Rogers v. Larson, 563 F.2d 617 (3d Cir. 1977) for the proposition that the DOL exceeded its authority by failing to consider "employer hardship" in promulgating the 2011 wage rule. (Doc. 115, at 37-44.) Rogers involved a preemption challenge to a territorial statute regulating foreign workers inside the United States that required an employer to terminate a foreign worker if the territorial authority determined that a United States worker was available to take the foreign worker's position, even though the foreign worker had not yet concluded his or her authorized period of stay. Id. at 620. The court held that the territorial statute was preempted because it conflicted with the federal statute's goal of providing employers continuity in their workforce. Id. at 626. In so holding, the Rogers court observed that

the federal statute and the territorial statute were designed to "assure an adequate labor force on the one hand and to protect the jobs of citizens on the other." Id.

In promulgating the 2011 wage rule, the DOL did not run afoul of the Third Circuit's observation in Rogers. The agency considered both employers' need to have an adequate workforce and the need to set a prevailing wage that protected the U.S. labor market. See Final 2011 Rule, supra, 76 Fed. Reg. at 3454, 3463, 3470. The DOL concluded that the new methodology would result in "more accurate" calculations of the prevailing wage than did the four-tier skill level methodology, which it found to have an "adverse effect" on the income of United States workers. Id. The fact that more accurate prevailing wage calculations result in employers being required to pay higher wages does not mean that the DOL failed to consider employers' interest in an adequate labor supply. See Rogers, 563 F.2d at 626.

In developing its new wage methodology, the DOL took sufficient account of employers' interests. The purpose of the H-2B program is to permit the recruitment of foreign workers by employers who cannot find capable United States workers who are willing to work for them at the prevailing wage; the statute does not countenance recruitment that has an adverse effect on the wages of United States workers. See Fla. Sugar Cane League, 531 F.2d at 304 (explaining that the importation of foreign labor is not permitted for the purpose of avoiding increased labor costs). To the extent that "employer hardship" results from the adoption of a prevailing wage methodology that avoids an adverse effect on the income of United States workers, the DOL was not required to consider it. Cf. Entergy Corp. v. Riverkeeper, Inc., 556 U.S. 208, 222-23 (2009) (in the face of statutory silence, agency has discretion regarding cost-benefit analysis).

The employer associations also make the related argument that the DOL improperly

established wages to attract United States workers. (Doc. 115, at 44-48.)  In support, employer associations cite to <u>Williams v. Usery</u>, 531 F.2d 305, 306 (5th Cir. 1976), in which the Fifth Circuit observed that "the Secretary has no authority to set a wage rate based on attractiveness to workers."  The court went on to hold that the Secretary's "authority is limited to making an economic determination of what rate must be paid to all workers to neutralize any 'adverse effect' resultant from the influx of temporary foreign workers."  <u>Id.</u>

In the preamble to its final rule, the DOL observed that the new prevailing wage methodology would result in wages that would be "acceptable" to United States workers because they would "more closely reflect the average wages paid to similarly employed workers in the area of intended employment."  Final 2011 Rule, <u>supra</u>, 76 Fed. Reg. at 3454.  Observing that, historically, the demand for H-2B visas has vastly exceeded the supply, the DOL predicted that the 2011 wage rule "could . . . result in a more efficient distribution of H-2B visas to employers who can less easily attract available U.S. workers . . . so that those participating in the H-2B program after the rule is in place will be those who have a greater need for the program."  <u>Id.</u>  at 3470.  This is consistent with the goal of avoiding an "adverse effect" on the United States labor market, and does not demonstrate an intent on behalf of the DOL to drive up wages in order to attract United States workers.

4.   <u>Compliance with the RFA</u>

Whenever the APA requires an agency to publish a notice of proposed rulemaking, the RFA mandates that "the agency shall prepare and make available for public comment an initial

38

regulatory flexibility analysis." 5 U.S.C. § 603.[18]  The requirements of the RFA are "[p]urely

procedural." U.S. Cellular Corp. v. FCC, 254 F.3d 78, 88 (D.C. Cir. 2001).  The RFA requires

"that the agency file a [final regulatory flexibility analysis] demonstrating a 'reasonable, good-

faith effort to carry out [the RFA's] mandate.'" Id. (quoting Alenco Commc'ns, Inc. v. FCC, 201

F.3d 608, 625 (5th Cir. 2000)).  In addition, courts read the RFA and the APA together to "require

that a rule's impact on small businesses be reasonable and reasonably explained." Nat'l Tel. Co-

op Ass'n v. FCC, 563 F.3d 536, 540 (D.C. Cir. 2009).

When an agency promulgates a final rule, the RFA requires that it prepare a final

regulatory flexibility analysis.  5 U.S.C. § 604.  The final analysis must contain, among other

things:

> a description of the steps the agency has made to minimize the significant
> economic impact on small entities consistent with the stated objectives of
> applicable statutes, including a statement of the factual, policy and legal reasons
> for accepting the alternative adopted in the final rule and why each one of the other
> significant alternatives to the rule considered by the agency which affect the impact
> on small entities was rejected.

Id. at § 604(a)(6).

The employer associations argue that the DOL failed to make a reasonable, good faith

RFA analysis.  (Doc. No. 115 at 78.)  They contend that the DOL: (1) failed adequately to

consider the impact the wage rule would have on small entities; and (2) failed to consider

reasonable alternatives to the proposed rule. (Doc. No. 115 at 78-79.)  Both contentions lack

merit.

---

[18] Pursuant to 5 U.S.C. § 605(b), an agency is not required to perform a regulatory
flexibility analysis "if the head of the agency certifies that the rule will not, if promulgated, have
a significant economic impact on a substantial number of small entities."  The Secretary of Labor
did not make such a certification in this case.

The DOL conducted an extensive regulatory flexibility analysis, see Final 2011 Rule,

supra, 76 Fed. Reg. at 3473-82, in which it addressed possible steps to minimize the rule's impact

on small entities, and gave extensive consideration to alternatives to the proposed rule.  With

regard to the rule's economic impact on small entities, the agency explained,

> The Department's mandate under the H-2B program as extended to it by the
> Department of Homeland Security under the INA is to set requirements for
> employers that wish to hire temporary foreign non-agricultural workers.  Those
> requirements are designed to ensure that foreign workers are used only if qualified
> domestic workers are not available and that the hiring of H-2B workers will not
> adversely affect the wages and working conditions of similarly employed domestic
> workers.  This Final Rule sets those minimum standards with regard to wages.  As
> discussed throughout this Final Rule, the required wage rate, as established by the
> methodology set in this rule, determines whether U.S. workers' wages will be
> adversely affected by the hiring of an H-2B worker.  A different and presumably
> lower standard applied to small business would potentially result in the very
> adverse effect that the Department is compelled to prevent.  As a result, a different
> standard for this class of employers cannot be implemented by the Department.

Id. at 3482.

The employer associations object to this reasoning on the ground that it does not

adequately consider employer hardship.  The scope of the RFA analysis is determined by the

substantive law under which the rule was issued.  The statute requires that the agency provide "a

description of the steps the agency has taken to minimize the significant economic impact on

small entities *consistent with the stated objectives of the applicable statutes*." 5 U.S.C. § 604(a)(6)

(emphasis added).  The RFA's legislative history makes clear that its requirements "are not

intended as a basis for a substantive challenge to the exercise of discretion by the agency in

determining what rule ultimately to promulgate," and that it should not be construed in a way that

weakens "legislatively mandated goals in the name of cost reduction." S. Rep. No. 96-878, at 10,

14 (1980); see also 126 Cong. Rec. at S21,459-60 (daily ed. Aug. 6, 1980).

In the present case, the statute's stated goal is to provide for the admission of H-2B workers "if unemployed persons capable of performing such service or labor cannot be found in this country." 8 U.S.C. § 1101(a)(15)(H)(ii)(b). The DOL reasonably concluded that adopting a standard that would permit small businesses to pay their H-2B workers wages below the prevailing wage as calculated by the rule's methodology would likely have an adverse effect on the wages of United States workers, in contravention of the objectives of the statute.

The employer associations point to several alternatives raised in comments on the notice of proposed rulemaking that the DOL did not specifically address in its final regulatory flexibility analysis, and they argue that the DOL erred in failing to consider those alternatives. (Doc. No. 115 at 79.) The RFA requires that an agency explain "why each one of the other significant alternatives to the rule considered by the agency which affect the impact on small entities was rejected." 5 U.S.C. § 604. In enacting § 604, Congress emphasized that,

> this provision does not require that an agency adopt a rule establishing differing compliance standards, exemptions, or any other alternative to the proposed rule. It requires that an agency, having identified and analyzed significant alternative proposals, describe those it considered and explain its rejection of any which, if adopted, would have been substantially less burdensome on the specified entities. Evidence that such an alternative would not have accomplished the stated objectives of the applicable statutes would sufficiently justify the rejection of the alternative.

126 Cong. Rec. at S21,459-60; see also S. Rep. No. 96-878, at 14. In other words, § 604 requires only that agencies "give explicit consideration to less onerous options" that are consistent with the purpose of the organic statute. Associated Fisheries of Maine, Inc. v. Daley, 127 F.3d 104, 114 (1st Cir. 1997).

In the present case, after expressly considering nine proposed alternatives, the DOL addressed the remaining comments in a general paragraph, explaining that it rejected those

alternatives because they would "at worst reduce and at best not improve the efficiency and

consistency of the prevailing wage determination process, or would directly or indirectly

adversely affect the wages of U.S. workers who might take H-2B jobs."  Final 2011 Rule, supra,

76 Fed. Reg. at 3481-82.  The employer associations offer no arguments as to why, in their

opinion, the DOL did not reasonably reject each of the proposed alternatives that they list on

efficiency grounds or because they would have an adverse effect on the wages of U.S. workers, in

contravention of the stated objectives of 8 U.S.C. § 1101(a)(15)(H)(ii).  The DOL's explanation

of its rejection of those alternatives therefore satisfied the lenient requirements of the RFA.[19]

---

[19]  In their Motion for Summary Judgment, the employer associations raise a challenge to the DOL's April 14, 2011, notice modifying the Appendix to ETA form 9142, Application for Temporary Employment Certification, to require employers to certify that they will pay the prevailing wage that "is or will be issued" to the employer for the period of the certification's validity. 76 Fed. Reg. 21,036 (Apr. 14, 2011).  The complaint nowhere mentions the DOL's April 14, 2011, notice.  A motion for summary judgment is not an appropriate vehicle to raise new claims.  The employer associations waived any challenge to the DOL's April 14, 2011, notice by failing to amend their complaint to state such a claim.  See Warfield v. SEPTA, 460 F. App'x 127, 132 (3d Cir. 2012) (holding that plaintiff waived claim raised at summary judgment by not moving to amend complaint to assert claim) (citations omitted); Josey v. John R. Hollingsworth Corp., 996 F.2d 632, 641-42 (3d Cir. 1993) (holding that court properly rejected claim raised for the first time in pretrial memorandum).

Even if the challenge were properly before us, it would fail.  First, contrary to the employer associations' argument, the April 14 notice does not conflict with 8 C.F.R. § 214.2(h)(9)(iii)(B)(1) (providing that approval of an H-2B visa petition "shall be valid for the period of the approved temporary labor certification").  That regulation governs only the period of validity for an approved H-2B visa petition; nothing in it speaks to whether the DOL may redetermine the prevailing wage that employers must pay during the period of validity.

Second, the DOL was not required to engage in notice-and-comment rulemaking to add the language "will be issued" to the Appendix to ETA form 9142, Application for Temporary Employment Certification.  Notice-and-comment rulemaking is required only when an agency adopts a "substantive" or "legislative" rule.  5 U.S.C. § 553(b); Chrysler Corp. v. Brown, 441 U.S. 281, 301-03 (1979).  The change in language was not such a rule.  Employers are already required by regulation to obtain a certification from the DOL that the H-2B worker's employment will not "adversely affect the wages and working conditions of similarly employed United States workers."  8 C.F.R. § 214.2(h)(6)(iii).  The new language in the form, requiring employers seeking labor certification to promise to pay the prevailing wage that "will be" issued during the

III.     Conclusion

For the reasons stated above, the federal defendants' motion for summary judgment (Doc.

No. 43) will be granted, and the employer associations' motion for summary judgment (Doc. No.

115) will be denied.

---

validity of the labor certification, simply clarifies for employers that the wages they are required
to pay H-2B workers may change if the DOL issues a new prevailing wage determination.  The
amendment is not substantive.  See Chao v. Rothermel, 327 F.3d 223, 227 (3d Cir. 2003); 76
Fed. Reg. at 21,036.